## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

### *Electronically Filed*

| | | |
|---|---|---|
| **BRITTANY JACKSON,** | ) | |
| **255 White Gravel McDaniel Rd** | ) | |
| **Minford, OH 45653** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | **CASE NO.  3:22-CV-00244** |
| | ) | |
| | ) | **JUDGE: MICHAEL NEWMAN** |
| **V.** | ) | |
| | ) | |
| **HARBORCHASE OF** | ) | |
| **BEAVERCREEK** | ) | **COMPLAINT** |
| **4175 Indian Ripple Rd.** | ) | |
| **Beavercreek, OH 45440** | ) | |
| | ) | **WITH JURY DEMAND** |
| **Serve:** | ) | |
| **Bryan Davenport** | ) | |
| **4175 Indian Ripple Rd.** | ) | |
| **Beavercreek, OH 45440** | ) | |
| | ) | |
| **HARBOR RETIREMENT** | ) | |
| **ASSOCIATES LLC** | ) | |
| | ) | |
| **Serve:** | ) | |
| **Cogency Global, INC** | ) | |
| **C/O Chris Collins** | ) | |
| **1 15 North Calhoun St.,** | ) | |
| **Tallahassee, FL 32301** | ) | |
| | ) | |
| **DEFENDANTS** | ) | |

For the complaint against HarborChase at Beavercreek and their corporate owner, Harbor

Retirement Associates, LLC (collectively Defendants), Plaintiff allege and aver as follows:

1.      Throughout the COVID-19 pandemic, the Plaintiff, Brittany Jackson stood ready, willing, and able to take safety precautions in the workplace as required by their past employer, even when that workplace asked them to reuse PPE and wear rain ponchos in place of proper gowns to prevent the spread of COVID-19 to those residents for whom they served. The Plaintiff, however, has religious beliefs and medical conditions that conflicts with one of their past employer's safety policies: mandatory vaccination without the proper ability to have their protected conflicts rightfully considered. The Plaintiffs' conflicts are protected by federal and state law. This case is a challenge to the lawfulness of the policy imposed by the Defendant, the implication of said policy, as well as an attempt to prevent unlawful discrimination based on religion and disabilities in the future and to hold her past employer accountable for the harm they suffered at its hands.

2.      Federal and state law recognize an employee has a right to have religious beliefs and/or medical disabilities considered when those beliefs and disabilities conflict with an employer's policies, and, when possible, accommodated. The Defendants, HarborChase at Beavercreek and Harbor Retirement Associates, ignored federal and state law and instead applied its own set of rules when it comes to religious and medical accommodations and exemptions to its mandatory COVID-19 vaccination policy. Defendant then wrongfully denied Plaintiffs' request by having no policy to allow religious exemptions to be considered. The medical exemption policy required deadline for accommodations made it in effect impossible for the Plaintiff to gather all the needed documents to submit a medical exemption to the covid vaccine mandate. The religious exemption process did not exist at all. This was done in violation of Defendant's obligations under Title VII of the Civil Rights Act of 1964 ("Title VII")

and Section 4112.02 of the Ohio Revised Code ("O.R.C. § 4112.02") as well as The Americans with Disabilities Act and the Ohio Fair Employment Practice Law (O.R.C. § 4112.01)

3.      Defendants' actions left the Plaintiff with the impossible choice of either taking the COVID-19 vaccine, at the expense of her religious beliefs and her health or losing her livelihood.

4.      Under Title VII, the ADA, and Ohio law, an employer must provide a legitimate opportunity to seek a religious and medical accommodation. The employer cannot summarily impose employer-preferred workplace rules that abridge an employee's federally protected rights without genuine, good-faith dialogue and consideration of proposed accommodations with objective evidence, and, if the employer chooses to deny an employee accommodation request, proof that allowing the accommodation would place an undue burden on the employer. The conduct of HarborChase at Beavercreek and Harbor Retirement Associates was in violation of these laws.

## **PARTIES**

5.      The Plaintiff, Brittany Jackson, is a resident of the Dayton area of Ohio. She worked just under two years for the Defendants. Ms. Jackson has strong sincere religious objections and medical disability that precludes her from taking the COVID-19 vaccines.

6.      The Defendant HarborChase of Beavercreek is incorporated in the State of Ohio, with its principal place of business 4175 Indian Ripple Rd

Beavercreek, OH 45440 .  Defendant HarborChase is owned by Defendant Harbor Retirement Associates LLC. Harbor Retirement Associates is incorporated in FL with its principal place of business 958 20th Pl, Vero Beach, FL 32960, United States. Actual direction, control,

coordination and vaccine mandate originated from the Defendant employer in Beavercreek, Ohio.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the parties pursuant to 28 U.S.C. § 1331 & 1343 because the Complaint seeks relief and damages under federal statute, 42 U.S.C. § 2000e-5(f) of the Civil Rights Act of 1964, as amended ("Title VII") and 42 USC § 1981a; and under 42 USC §12117 and 12033, of the American with Disabilities Act of 1990, as amended (ADA). The court has further supplemental jurisdiction over the Plaintiff's state law claim arising from the same events and occurrences under O.R.C. § 4112.02 pursuant to 42 U.S.C. § 1367.

8.     Venue is proper in this district pursuant to U.S.C. § 1391(b) because the relevant events took place in Beavercreek, Ohio, which is in the Southern District of Ohio, Western Division and the Defendant's principal place of business is located therein.

9.     The Court has personal jurisdiction over the Defendant because the Defendant resides and conducts business in this judicial circuit.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10.     On approximately December 20, 2021, Plaintiff timely filed charges of discrimination with the Ohio Civil Rights Commission ("OCRC"). OCRC has a dual filing agreement with the Equal Employment Opportunity Commission ("EEOC").

11.     Her Notice of Right to Sue from the Federal EEOC was issued on June 1, 2022 with Ms. Jackson receiving notice on June 5, 2022. (attached hereto as **Exhibit A**).

12.     Her Notice of Right to Sue from the OCRC was mailed on April 28,2022. (attached hereto as **Exhibit B**).

13.    This Complaint is being timely filed based on the date Plaintiff received her

Notice(s) to Right to Sue.

14.    All administrative prerequisites to the filing of this suit have been meet.

## FACTS

15.    Ms. Jackson has strong sincere religious objections to the covid vaccines.  She

also has medical issues that would have justified a medical exemption to be vaccinated

including, but not limited to, Hydrocephalus:

> the buildup of fluid in the cavities (ventricles) deep within the brain. The excess
> fluid increases the size of the ventricles and puts pressure on the brain.
>
> Cerebrospinal fluid normally flows through the ventricles and bathes the brain and
> spinal column. But the pressure of too much cerebrospinal fluid associated with
> hydrocephalus can damage brain tissues and cause a range of brain function
> problems.
>
> *See*:    https://www.mayoclinic.org/diseases-conditions/hydrocephalus/symptoms-
> causes/syc-20373604

This condition has required Ms. Jackson to have numerous surgeries on her brain, lungs, heart,

and abdomen to address the hydrocephalus to limited success.  Ms. Jackson approached Bryan

Davenport, the Executive Director of HarborChase at Beevercreak, and asked him how she could

file for a medical exemption. He responded by saying that corporate would not approve anything

religious or medical and that it would be a waste of time to try.  Furthermore, her direct boss,

Cherie Grubie, told Ms. Jackson that if she was fired for not being vaccinated, she would not get

a good reference from Ms. Grubie, and/or Davenport even though Ms. Jackson was a well-

respected valuable employee.  Furthermore, Ms. Jackson was told to just quit and that she would

not get unemployment as she was mocked and laughed at by Ms. Grubie and told to "just shut up

and take the vaccine." Ms. Jackson would have filed for both a religious and medical exemption

had there been a fair process by which to file. However, the vaccine mandate dated on August 12, 2021, and presented to Ms. Jackson on August 16th or 17th (attached hereto as **Exhibit C**), required all employees to be fully vaccinated against COVID-19 by September 13, 2021, did not provide for such opportunities. In fact, the Defendant's vaccine mandate did not provide for *any* process for an employee to file for a religious or medical exemption. Ms. Jackson and the other employees of the Defendant had to ask the Executive Director, Bryan Davenport, how to submit a medical exemption. He stated that she'd have to submit her full medical records tracking back numerous years and have her exemption approved by the September 13th date or she would be fired. Ms. Jackson attempted to meet these conditions and began gathering medical records dating back all the way to her childhood. However, numerous medical offices told her that they would be unable to provide her with her medical records fast enough for Ms. Jackson to adhere to the mandated date requirement because of the chaos in the healthcare system during the summer of 2021. As a result, she was illegally terminated before she could complete her medical exemption request. Additionally, the Defendants never provided any religious exemption policy. The only policy provided in writing to Ms. Jackson, and all the employees, was the August 12th document that stated: "**all HarborChase Associates must be vaccinated to remain employed in our communities and to serve our residents**." (*Emphasis in original*).

## ALLEGATIONS

16. In March 2020, American life was irreparably changed both by COVID-19 and by various governments and employers' response to it. COVID-19 is a virus that was first detected in Wuhan, China, and eventually made its way to the United States of America, setting off a chain of events that has irretrievably changed the day-to-day life of many, if not most, Americans.

17.     In the spring of 2020, the Defendant began implementing procedures for its workforce, including several of the following requirements for its employees: masks, social distancing, temperature checks, COVID-19 testing, and self-quarantine. Upon information and belief, the Defendant had substantial success reducing the risk of COVID-19 spread through these efforts.

18.     Despite the Defendant's success in controlling the spread of COVID-19 in its workspace, the Defendant chose to implement a blanket vaccine mandate, based on reasoning unsupported by science, and improperly implemented its vaccine mandate in violation of Title VII, the ADA, O.R.C. § 4112.01 and O.R.C. § 4112.02.

19.     Furthermore, the Defendant improperly terminated the Plaintiffs for refusing to comply with one of its safety procedures – mandated vaccination – which has limited results in preventing the transmission of disease in the workplace, ignores natural immunity, and improperly assesses risk. All of this was done without proper opportunity and consideration of the Plaintiffs' rights and a legitimate opportunity to request accommodations based on their sincerely held religious beliefs, medical conditions, and whether the accommodations would be an undue burden and/or direct threat on the Defendants, which is required under Title VII, the ADA, and state law.

**The Defendant pivoted from successful and proven COVID-19 mitigation practices and improperly chose mandated vaccination as its sole safety procedure upon which it predicated employment.**

A. The vaccine mandate is unlawful as enforced and written.

20.     The Food and Drug Administration ("FDA") issued an Emergency Use Authorization ("EUA") for the Pfizer-BioNTech vaccine on December 1, 2020 for select populations. One week later a second EUA for the Moderna COVID-19 vaccine was issued. The

FDA issued an EUA for the Johnson & Johnson COVID-19 vaccine on February 27, 2021. On

August 23, 2021, the FDA issued full approval for the Pfizer-BioNTech COVID-19 vaccine

marketed as Comirnaty. However, it should be noted, that the FDA has admitted the Comirnaty

vaccine, which is legally distinct from the Pfizer vaccine that is currently available in the UK,

has never been available in the US. On January 31, 2022, the FDA announced its approval of the

Moderna COVID-19 vaccine, to be marked as Spikevax, which has the same formulation as the

EUA-approved Moderna vaccine.[1]

21.    Though the FDA has approved the use of a currently unavailable vaccine for

future use, the only vaccines widely available for use in the United States are these three

experimental, investigative and unlicensed drugs, all of which were either developed, tested, or

produced with the use of fetal cells from aborted fetuses.

22.    Since the rollout of the vaccines, more and more data increasingly show the

vaccines do not prevent infection, do not prevent transmission, and do not prevent illness.

Indeed, countries with the most aggressive, expansive use of the vaccines have seen record-

setting infection rates and continuing high illness rates.

23.    Scientists studying over 4,000 frontline workers found that between

December 2020 until April 2021, the effectiveness of the vaccines cratered from 91 percent to 66

percent. This drastic decline occurred before the Delta and Omicron variants became dominant

variants.[2]

---

[1] FDA, *Spikevax and Moderna COVID-19 Vaccine* (Jan. 31, 2022) available at
https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/spikevax-and-moderna-covid-19-vaccine.
[2] Ashely Fowlkes, et al., *Effectiveness of COVID-19 Vaccines in Preventing SARS-CoV-2 Infection Among Frontline Workers Before and During B.1.617.2 (Delta) Variant Predominance – Eight U.S. Locations, December 2020-August 2021,* 70 Morbidity and Mortality Weekly Report (Aug. 27, 2021) available at https://www.cdc.gov/mmwr/volumes/70/wr/mm7034e4.com.

24.     Even more alarming, research focusing on the Pfizer vaccine's effectiveness in America shows that from December 14, 2020, until August 8, 2021, the vaccine plummeted in effectiveness, collapsing from 88 percent to 47 percent.[3]

25.     In addition, governmental authorities have revised their definition of the word "vaccine" itself in order to continue to label these experimental drugs with novel ingredients "vaccines" because they fail to meet the test of traditionally defined vaccines, which actually inoculated against infection and prevented transmission, neither of which these vaccines can any longer claim credit for – this reflects the fact there has never been a successful COVID-19 vaccine in history due to the viral evolution each virus mutates into.[4]

B. The vaccine mandate ignores natural immunity.

26.     The National Institutes of Health and other bodies have found that natural immunity to COVID-19 – that is, immunity cause by infection with COVID-19 and recovery – is incredibly strong. Specifically, antibodies against the spike protein of the COVID-19 virus remain in 98% of people who have recovered from the virus six to eight months after infection (and the outer limit of the study was simply because the study was done on individuals where were six to eight months out of recovery, not because immunity begins to wear off).[5]

27.     Health and Human Services' Assistant Secretary, Dr. Admiral Brett

---

[3] Sara Y. Tartof, et al., *Six-month Effectiveness of BNT162b2mRNA COVID-19 Vaccine in a Large US Integrated Health System: A Retrospective Cohost Study,* Lancet, 2021 Oct. 16, 398 (10309):1407-16, available at https://pubmed.ncbi.nlm.nih.gov/34619098/.

[4] Katie Carrero, *Why did the CDC change its definition for 'vaccine'? Agency explains more as skeptics lurk,* MIAMI HERALD (Sept. 27, 2021) available at https://wwww.miamiherald.com/news/coronavirus/artcle254111268.html.

[5] NIH, *Lasting Immunity Found After Recovery from COVID-19*, NIH (Jan. 26, 2021), available at https://www.nih.gov/news-events/nih-research-matters/lasting-immunity-found-after-recovery-covid-19.

Giroir stated in August 2021, in a nationally televised interview, that "there are still no data to suggest vaccine immunity is better than natural immunity. I think both are highly protective."[6]

28.     The data out of the State of Israel underscores this point. In a paper awaiting peer review, scientists out the State of Israel report that in studying thousands of patients, those whose only source of immunity was a vaccine (in the case of Israel, the Pfizer vaccine was used) had a 5.96 to 13.06-fold increased risk of a breakthrough infection with the Delta variant of COVID-19 over those whose immunity was natural.[7]

29.     Israel is one of the most vaccinated places in the world, with close to 80% of the country having been vaccinated. Israel's bout with the Delta variant of COVID-19 has demonstrated that the Pfizer vaccine, once considered the Cadillac of the three COVID-19 vaccines, is only 64% effective at preventing symptomatic cases of COVID-19.[8] Moreover, despite Israel's high vaccination rates, Israel is becoming "the world's COVID hotspot."[9]

30.     In addition, in a recent study concerning the Omicron variant, scientists found that the variant "can evade immunity from COVID-19 more so than any other previous variants discovered during the course of the pandemic."[10] "Researchers studied over

---

[6] FOX NEWS, *Admiral Brett Giroir explains natural immunity to COVID-19*, Admiral Brett Giroir (Aug. 13, 2021) available at https://www.youtube.com/watch?v=O641EW4okPs.
[7] Sivan Gazit, et al., *Comparing SARS-CoV-2 Natural Immunity to Vaccine -Induced Immunity: Reinfections Versus Breakthrough Infections*, medRvix (Aug. 25, 2021), available at https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf.
[8] Aaron Blake, *Vaccine doubters' strange fixation with Israel*, WASHINGTON POST (Jul. 22, 2021) available at https://www.washingtonpost.com/politics/2021/07/19/vaccine-skeptics-zero-israel-again-some-reasons/.
[9] Conor Boyd, *Israel is not the world's Covid hot spot: Cases sours despite country's trail blazing vaccine roll-out – sparking fears other highly-vaccinated countries will be hit by another wave due to jabs' waning immunity*, DAILY MAIL (Sept. 3, 2021) available at https://dailymail.co.uk/news/article-9951117/Isreal-worlds-covid-hotspot-0-2-population-catching-yesterday.html.
[10] Shirin Ali, *New study finds omicron variant better at evading immunity*, THE HILL (Jan. 3, 2021) available at https://thehill.com/changing-america/well-being/prevention-cures/588040-

11,000 Danish households and found that those who had the Omicron variant had a 31 percent chance of a secondary attack rate (SAR), which refers to the probability an infection occurs within a specific group like a household or close contacts."[11] Moreover, the study revealed that "vaccine effectiveness was reduced to around 40 percent against symptoms and to 80 percent against severe disease. . ."[12]

31.     The now well-known study of the effects of natural immunity in the Cleveland Clinic Health System provides yet another example of the real-world superiority of natural immunity to vaccine immunity. That study compared "breakthrough infections" (re-infection after either contracting COVID-19 or taking a vaccine) among employees of the Cleveland Clinic Health System and found that those who were previously infected and unvaccinated, 1359 people, none suffered breakthrough infections. [13]

32.     Another newly published study found that there is "no discernable relationship between percentage of population fully vaccinated and new COVID-19 cases in the last [seven] days."[14] The study found to the contrary that there was a "marginally positive association such that countries with higher percentage of population fully vaccinated have higher COVID-19 cases per [one] million people."[15] That study, which analyzed 68 different countries'

---

new-study-finds-omicron-variant-better-at citing and referencing
https://www.medrxiv.org/content/10.1101/2021.12.27.21268278v1.
[11] *Id.*
[12] *Id.*
[13] Nabin K. Shrestha, et al., *Necessity of COVID-19 Vaccine in Previously Infected Individuals*, medRxiv (Jun. 19, 2021), available at
https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v3.
[14] S.V. Subramanian and Aknil Kumar, *Increases in COVID-19 are Unrelated to Levels of Vaccination Across 68 Countries and 2947 Counties in the United States,* Eur J Epidemiol 2021 Sep 30:1-4, https://doi.org/10.1007/s10654-021-00808-7, available at
https://link.springer.com/article/10.1007/s10654-021-00808-7.
[15] *Id.*

vaccination rates and the rate of new COVID-19 cases, specifically referred to Israel, Portugal and Iceland, each of which is highly vaccinated and which had more cases per one million people than, for example, Vietnam and South Africa, which had around ten percent of their population fully vaccinated.[16]

33.     Several scholarly journals have also weighed in on the superiority of natural immunity to vaccine immunity.[17] Further, those who previously were infected with COVID-19 were at greater risk for bad side effects associated with the vaccine - in such cases, the vaccine might even weaken their pre-existing immunity.[18]

34.     While the vaccines have been effective at preventing serious cases and deaths, they lag far behind natural immunity in preventing symptomatic cases of COVID-10, and, therefore, transmission of COVID-19.

C.     The vaccine mandate relies on an improper assumption about the infection-fatality rate and asymptomatic spread.

35.     COVID-19 presents a risk primarily to individuals aged 85 or older[19] and those with comorbidities such as hypertension and diabetes.[20]

36.     The majority of deaths associated with COVID-19 occur in those

---

[16] *See id.*

[17] Jackson S. Turner, et al., *SARS-CoV-2 Infection Indicates Long-lived Bone Marrow Plasma Cells in Humans*, NATURE, 595, 421-25 (May 24, 2021), available at https://www.nature.com/articles/s41586-021-03647-4.

[18] Carmen Camara, et al., *Differential Effects of the Second SARS-CoV-2 mRNA Vaccine Dose on T Cell Immunity in Naïve and COVID-19 Recovered Individuals*, bioRxiv (Mar. 22, 2021) https://doi.org/10.1101/2021.03.22.436441, available at https://www.biorxiv.org/content/10.1101/2021.03.22.436441v1.

[19] Mayo Clinic, *COVID-19: who's at higher risk of serious symptoms* (Jan. 22, 2022) available at: https://www.mayoclinic.org/diseases-conditions.

[20] Wren Hann, et al., *Comorbidities in SARS-CoV-2 Patients: a Systematic Review and Meta-Analysis*, ASM Journals/mBio/Vol.12, No. 1 (Feb.9, 2021) https://doi.org/10.1128/mBio.03647-20, available at https://journals.asm.org/doi/10.1128/mbio.03647-20?permantly+true&.

over the age of 55.[21] Within the most heavily impacted age group (age 85 and up), only 13.3% of

deaths from February 2020 to February 2021 were attributed to COVID-19.[22]

37.     One of the most useful measures for calculating the risk of dying from a virus is

the infection-fatality rate ("IFR"). The IFR is calculated by dividing the number of COVID-19

deaths by the number of COVID-19 infections. It attempts to answer the critical question: "If I

get sick, what is the chance that I will die?" The Center for Disease Control and Prevention

("CDC") estimates the IFR for the bulk of most working-age adults is exceedingly low.[23] For

adults under age 50, the CDC's "current-best estimate" is that 500 people will die per 1,000,000

infections nationwide.[24] In other words, for every one million adults infected age 50 or younger,

999,500 of them will survive COVID-10.[25]

38.     Assuming the data regarding COVID-19 infections is accurate, the

CDC's numbers show Americans across the board are far more likely to die of something other

than COVID-19, which casts considerable doubt on the Defendant's assertions that all

employees should be vaccinated.[26]

39.     The Defendant already employed a legal and justifiable method of preventing

COVID-19 spread from the symptomatic – self-quarantine. The Defendant's vaccine mandate

---

[21] *Id.*

[22] Heritage Foundation, *COVID-19 deaths by age* (Feb. 17, 2021) available at
https://datavisualizations.heritage.org/public-health/covid-19-deaths-by-age/.

[23] CDC, *COVID-19 Pandemic Planning Scenarios* (Mar. 19, 2021) available at
https://www.cdc.gov/oronavirus/2019-ncov/hcp/planning-scenerios.html.

[24] *Id.*

[25] *Id.*

[26] Smiriti Mallapaty, *The Coronavirus Is Most Deadly If You Are Older and Male,* NATURE
(Aug. 28, 2020) (demonstrating that individuals under 50 face a negligible threat of a severe
medical outcome from a coronavirus infection, akin to the types of risk that most people take in
everyday life, such as driving a car) available at https://www.nature.com/articles/d41586-020-
02483-2.

only addresses one risk: asymptomatic lethal spread. The problem with the Defendant's mandate is two-fold: first, asymptomatic lethal spread is significantly less of a threat than the Defendant seems to assert,[27] and second, testing more effectively, and easily, suffices rather than forced injections of unwanted experimental, potentially life-altering drugs developed in ways that offend the Plaintiffs' religious beliefs, discriminates against them because of their sincerely held religious beliefs or conflicts with the ADA and/or state laws.

40.      The Defendant uses the specter of "asymptomatic spread" – the notion that fundamentally healthy people could transmit COVID-19 to others without having any symptoms of COVID-19 – to justify its vaccine mandate. But there is little credible scientific evidence that demonstrates the phenomenon of "asymptomatic spread" poses any meaningful danger to employees or anyone else for that matter. Indeed, it is "very rare" even according to Anthony Fauci, and, at worst, poses a one-in-a-million risk of lethal spread. The Defendant's response to COVID-19 is predicated, in part, on the flawed assumption that asymptomatic individuals pose a meaningful risk of spreading disease.

41.      Evidence of transmission requires that an individual can be shown to be the source of infection for another person who then developed symptoms of a disease/illness.

---

[27] Michael A. Johansson, et al., *SARS-CoV-2 Transmission from People Without COVID-19 Symptoms,* JAMA Netw. Open, 2021; 4(1):e2035057 (Jan. 7, 2021) http://doi.10.1001/Jamanetworkopen.202.35057, available at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774707. *See also* Kenneth McIntosh, et al., *COVID-19: Epidemiology, Virology, and Prevention,* WoltersKluner (Jan. 13, 2022) available at https://www.uptodate.com/contents/covid-19-epidemiology-virology-and-prevention#H3392906512.

42. Basic microbiology shows that infectiousness or transmission of viruses such as COVID-19 require an active infection resulting in elevated levels of viral replication in the host and shedding of the virus.[28]

43. Decades of research demonstrates that symptomatic people, such as those coughing, sneezing, and wheezing, are the real drivers of viral spread, a fact Dr. Anthony Fauci initially acknowledged during the early days of the pandemic when he told the press, "[E]ven if there is some asymptomatic transmission, in all the history of respiratory-born viruses of any type, asymptomatic transmission has never been the driver of outbreaks. The driver is always a symptomatic person." [29]

44. When the viral replication process is blocked by a healthy immune system, the virus is neutralized, preventing significant viral replication and shedding. This occurs in approximately half the people exposed to the virus. Their immune system's defenses effectively ward off COVID-19 before it can take hold and cause symptomatic disease. Research demonstrated that asymptomatic people are not the drivers of COVID-19 transmission as demonstrated in the following points.

45. Researchers studying real-world laboratory samples of more than a quarter-million people found that even with a positive RT-PCR test, asymptomatic people have a much lower probability of being infectious.[30]

---

[28] *See generally*, Samuel Baron, et al., *Medical Microbiology* (4th ed. 1996) available at: https://www.ncbi.nlm.nih.gov/books/NBK8149/. *See also* Hitoshi Kawasuji, et al., *Transmissibility of COVID-19 depends on the viral load around onset in adult and symptomatic patients*, PLOS ONE (Dec. 9, 2020) available at https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0243597.
[29] U.S. Department of Health and Human Services, *Update on the New Coronavirus Outbreak First Identified in Wuhan, China*, Press Briefing (Jan. 28, 2020) available at https://www.youtube.com/watch?v=w6koHkBCoNQ&t=2642s
[30] Andreas Stang, *The Performance of the SARS-CoV-2-RT-PCR Test as a Tool for*

46.     A research article published in the CDC's *Emerging Infectious Diseases* journal notes that little to no transmission of COVID-19 occurred from asymptomatic people studied by research in Germany.[31] The researchers note: "The fact that we did not detect any laboratory-confirmed SARS-CoV-2 transmission from asymptomatic case-patients is in line with multiple studies . . ."[32] The lack of scientific and medical evidence surrounding asymptomatic spread led the researchers to conclude that asymptomatic spread is "unlikely to substantially spread COVID-19.[33]

47.     A review in March 2021 of all the published meta-analysis on asymptomatic transmission from Dr. John Lee, a retired British Professor of Pathology, reveals that in many cases, the same few studies have been recycled repeatedly to support the flawed proposition that those who are asymptomatic pose a real danger.[34] In the words of Allyson M. Pollock, a professor of public health at Newcastle University in the United Kingdom, "[s]earching for people who are asymptomatic yet infectious is like searching for needles that appear and reappear transiently in haystacks, particularly when rates are falling."[35]

---

*Detecting SARS-CoV-2 Infection in the Population,* 83 J. Infect. 2 (Aug. 2021), https://doi:10.10161j.jinf.2021.05.022  available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8166461/.

[31] Jennifer K. Bender, *Analysis of Asymptomatic and Presymptomatic Transmission in SARS-CoV-2 Outbreak, Germany, 2020,* 27 Emerging Infectious Diseases 4 (April 2021) available at https://www.cdc.gov/cid/article/27/4/20-4576_article.

[32] *Id.*

[33] *Id.*

[34] *See* John Lee, *Asymptomatic spread: who can really spread COVID-19,* Health advisory & Recovery Team (Mar. 2021) available at https://www.hartgroup.org/wp-content/uploads/2021/03/ASYMPTOMATIC-SPREAD.pdf.

[35] Allyson M. Pollock, *Asymptomatic Transmission of Covid-19,* BMJ (Dec. 21, 2020) available at https://www.bmj.com/content/371/bmj.m4851.

48.     Moreover, according to FDA, there is insufficient data to determine the vaccines authorized for emergency use actually prevent asymptomatic infection or the transmission of SARS-CoV-2, the virus that causes COVID-19.[36]

49.     Recently, the CDC reported that "new scientific data" demonstrated that vaccinated people who experienced breakthrough infections carried similar viral loads to the unvaccinated (but not naturally immune), leading the CDC to infer that vaccinated people transmit the virus at concerning levels.[37]

50.     The Defendants' vaccine mandate "accommodation" – limiting asymptomatic unvaccinated employees from its workplace by terminating them – flies in the face of the current scientific literature, which shows asymptomatic spread of COVID-19 is virtually non-existent.

51.     In sum, little objective evidence exists to support a finding that asymptomatic spread is a driver of COVID-19 and, therefore, poses a danger to the Defendant's workplace including co-workers and/or residents. Rather, the epidemic spread of COVID-19 is propelled almost exclusively by symptomatic persons (many of whom are fully vaccinated) who can easily self-isolate or quarantine from their co-workers.

52.     A reasonable accommodation to vaccination is not to terminate perfectly healthy workers, and further to ban them from the workplace. The Defendant's vaccine mandate is nonsensical, unjust, and a violation of federal and state law.

---

[36] FDA, *Pfizer-BioNTech COVID-19 Vaccine Frequently Asked Questions,* (Nov. 19, 2020) available at https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/pfizer-biontech-covid-19-vaccine-frequently-asked-questions.
[37] *See CDC reversal on indoor masking prompts experts to ask, "Where's the data?",* WASHINGTON POST (Jul. 28, 2021) available at https://www.washingtonpost.com/health/breakthrough-infections-cdc-data/2021/07/28/dcaaa6b2-efce-11eb-a452-4da5fe48582d_story.html.

53.     The government-operated Vaccine Adverse Event Reporting System

("VAERS") database is intended to function as an "early warning" system for potential health

risks caused by vaccines. Presently, VAERS is broadcasting a red alert, but the Defendant is

refusing to take account this important data of adverse reactions to the vaccines and instead is

barreling down the tracks of forced vaccination at full steam.

54.     Recent data presents an alarming picture. As of August 12th 2022,

there have been 14,061 deaths reported to VAERS from COVID-19 vaccines in the United States

alone. Compared to just 8,673 for the preceding 30 years for all other vaccines.[38] According to

Josh Guetzhow, Ph.D., there are 91 times the number of deaths and 276 times the number of

coagulopathy events reported after COVID-19 vaccination than after flu vaccination. [39]

55.     Moreover, new research suggests the heightened risk of adverse effects results

from "preexisting immunity to SARS-CoV-2 [that] may trigger intense, albeit relatively rare,

inflammatory and thrombotic reactions in previously immunized and predisposed individuals,"

establishing individuals who have suffered from COVID-19 and recovered, and are forced to

vaccinate, are likely to experience those adverse events the government deemed as "rare". This

is the exact type of reaction Ms. Jackson is prone to given her well documented medical

condition.

56.     Although the number of VAERS reports is alarming in its own right, it is likely

the true number of adverse effects associated with the COVID-19 vaccines far exceeds cases

reported to VAERS. In 2010, a federal study commissioned by the U.S. Health and Human

---

[38] Josh Guetshow, *Safety signals for COVID vaccines are loud and clear. Why is Nobody Listening?* THE DEFENDER (Sept. 29, 2021) available at https://childrenshealthdefendse.org/defender/safety-signals-covid-vaccines-full-transparency-cdc-fda/.

[39] *Id.*

Services and performed by Harvard University consultants on behalf of the Agency for Health

care Research and Quality ("AHRQ") found that "fewer than 1% of vaccine adverse events" are

ever reported to VAERS.[40] Thus, it is likely that scores of adverse events associated with the

COVID-19 vaccines, including deaths, go unreported.

57.     It is not just VAERS that is broadcasting a red alert. On October 1, 2021, the

European Union's drug regulator, the European Medicines Agency ("EMA"), identified a new

possible link between rare cases of blood clotting in deep veins with Johnson & Johnson's

COVID-19 vaccine.[41] The EMA said the new, possibly life-threatening clotting condition

known as venous thromboembolism ("VTE") should be included on the Johnson & Johnson

product label as a possible side-effect of the shot.[42]

58.     What is more, the Moderna and Pfizer vaccines are made with

polyethylene glycol ("PEG") and Johnson & Johnson uses a similarly problematic ingredient:

polysorbate.[43] PEG has been linked to anaphylaxis in numerous recipients of the vaccine. PEG is

the delivery mechanism to the cells that keeps the mRNA from dispersing and not reaching its

intended target. PEG performs its intended use. Unfortunately, about 70% of the U.S. population

is slightly to somewhat allergic to PEG. The National Institute of Health ("NHI") recently began

---

[40] Ross Lazerus, et al. *Electronic Support for Public Health – Vaccine Adverse Event Reporting System (ESP:VAERS),* Agency for Healthcare Research and Quality (Sept. 30, 2010) available at https://digital.ahrq.gov./sites/default/files/docs/publication/r18hs017045-lazarus-final-report-2011.pdf.

[41] Reuters, EU finds J&J COVID shot possibly linked to another rare clotting condition, REUTERS (Oct. 1, 2021) available at https://www.reuters.com/business/healthcare-pharmaceuticals/eu-finds-jj-covid-shot-possibly-linked-another-rare-clotting-condition-2021-10-01/.

[42] *Id.*

[43] CDC, *COVID-19 Vaccines for People with Allergies* (Dec. 14, 2021) available at https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/specific-groups/allergies.html.

a clinical trial of "systematic allergic reaction to the Moderna or Pfizer-BioNTech COVID-19 vaccines" due to the recipients of those vaccines experiencing anaphylaxis.[44]

59.    According to the CDC, individuals who are allergic to PEG should not take the Moderna or Pfizer vaccines, and those who are allergic to polysorbate should not take the Johnson & Johnson vaccine.[45]

60.    Despite this known risk, the Defendant did not offer PEG allergy testing pre-vaccination and never offered any indemnity or disability coverage from any of the known and potential adverse effects of the COVID-19 vaccines.

61.    To summarize, the potential adverse effects the Plaintiff faced in being coerced to receive the COVID-19 vaccines pursuant to the Defendants' vaccine mandate is not theoretical, hypothetical or academic – they are very real and have real victims. Given the alarming reports of adverse side-effects associated with the COVID-19 vaccines, subjecting Plaintiff to vaccination exposes them to a variety of health risks ranging from headaches and blood clots to death.

### The Defendant improperly refused to allow the Plaintiff's religious exemption to be submitted in violation of Title VII; The ADA and O.R.C. § 4112.12

A.    The Defendant's improper conduct regarding the vaccine mandate policy and procedures and its communications with the Plaintiff regarding her request for a religious and/or medical exemption.

62.    On August 12, 2021, the Defendant announced its vaccination policy. *See*

**Exhibit C**.

63.    The vaccination mandate stated in part (emphasis in original):

---

[44] NIH, *NIH begins study of allergic reactions to Moderna, Pfizer-BioNTech COVID-19 vaccines* (Apr. 7, 2021) available at https://www.nih.gov/news-events/news-releases/nih-begins-study-allergic-reactions-moderna-pfizer-biontech-covid-19-vaccines.
[45] *See id.* at note 43.

After much thought and deliberation, we have very responsibly decided **all HarborChase Associates must be vaccinated to remain employed in our communities and to serve our residents. As the organization that has been chosen by our residents and their families to care for them and provide for their lifestyle, it is our responsibility to do everything reasonable and necessary to keep our residents safe. Unvaccinated Associates have 30 days (by September 13th) to comply.** Vaccinations continue to be the most important driver in ensuring the well-being of residents and staff across this industry, and it is our responsibility to ensure that our Associates are vaccinated.

64.     The vaccine mandate did not address the procedures for seeking a religious and/or medical exemption from the vaccine mandate.

65.     No updates to the August 12, 2021 policy were ever issued.

66.     Instead, employees were told verbally that if they wished to file a medical exemption that they would be required to file with corporate HR where *all* medical records would need to be included.  The approximate three weeks to gather all required medical documents made it impossible to meet the requirements of the vaccine mandate making it tantamount to no legal process by which medical exemptions could be filed.

67.     Employees were bullied and told to not even try to submit a medical and/or religious exemption because none would be granted and that the employees should simply quit so as not to get a bad review and that HarborChase needed to have 100% of their employees vaccinated.

68.     At no time did HarborChase at Beevercreak, nor anyone at Harbor Retirement Associates, provide the plaintiffs, nor anyone else, an opportunity to file for a religious exemption.

69.    The Plaintiff was terminated for not being vaccinated against the COVID-19 vaccine even though she bullied into not filing for a medical exemption and she was provided no opportunity to file for a religious exemption.

70.    Upon information and belief, the Defendant denied all opportunities for any religious and/or medical exemptions to be filed.

71.    While the production of the vaccines did not reportedly require any new abortions, Plaintiff objects to receiving the COVID-19 vaccines on the basis that, even assuming the vaccines do confer a meaningful health benefit, that benefit is one from ill-gotten gains.

72.    Plaintiff believes any benefit the COVID-19 vaccines may confer, flows from the unjust exploitation of unborn human life. Plaintiff refuses on religious ground to accept or be forced to accept the COVID-19 vaccines.

73.    Plaintiff objects to receiving the COVID-19 vaccine because she is a Christian, her body is the temple of the Holy Spirit and, as a Christian, she is compelled to protect her body from defilement. Insofar as the COVID-19 vaccines also contain neurotoxins, hazardous substances, attenuated virus, animal parts, foreign DNA, albumin from human blood, carcinogens and chemical wastes that a proven harmful to the human body, the Plaintiff finds the taking of the vaccine to be in direct conflict with her Christian duty to protect her body as the temple of the Holy Spirit.

B.    Scientific support for the Plaintiff's sincerely held beliefs.

74.    At the time of Ms. Jackson's termination, all COVID-19 vaccines made use either in production or testing of fetal cell lines developed from tissues originally derived from

aborted fetuses.[46] For example, the Johnson & Johnson vaccine used fetal cells cultures, specifically PER. C6, a retinal cell line that was isolated from terminated fetus in 1985.[47]

75.   As for the EUA-Pfizer and Moderna COVID-19 vaccines, fetal cell line HEK 293 was used during the research and development phase.[48] All HEK 293 cells are descended from tissue taken in 1973 from either an elective abortion or miscarriage that took place in the Netherlands. [49]

   C.  Federal law and State law prohibiting religious and disability discrimination.

76.   Title VII prohibits the Defendant from discriminating against employees based on their religion. This "include[s] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

77.   Title VII "imposes upon employers a 'statutory obligation to make reasonable accommodation for the religious observances of its employees, short of undue hardship." *Reed v. International Union, United Automobile, Aerospace and Agricultural Implement w\Workers of America*, 569 F.3d 576, 579 (6th Cir. 2009).

---

[46] *See* Los Angeles County Public Health, *COVID-19 Vaccine and Fetal Cell Lines*, https://publichealth.lacounty.gov/media/coronavirus/docs/vaccine/vaccinedevelopment_fetalcellines.pdf.
[47] *Are the vaccines made with fetal cells,* Institute for Clinical Systems Improvement, https://www.icsi.org/covid-19-vaccine-aq/are-the-mma-vaccines-made-with-fetal-cells.
[48] *See* Nebraska Medicine, *You asked, we answered: Do the COVID-19 vaccines contained aborted fetal cell?,* available at https://www.nebraskamed.com/COVID/you-asked-we-answered-do-the-covid-19-vaccines-contain-aborted-fetal-cells.
[49] *See* Los Angeles County Public Health, *COVID-19 Vaccine and Fetal Cell Lines*, https://publichealth.lacounty.gov/media/coronavirus/docs/vaccine/vaccinedevelopment_fetalcellines.pdf.

78.     A prima facie case of religious discrimination based on a failure to accommodate requires a plaintiff to show "(1) a bona fide religious practice conflicts with an employment requirement, (2) he or she brought the practice to the [defendant's] attention, and (3) the religious practice was the basis for the adverse employment decision." *E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rica*, 279 F.3d 49, 55 (1st Cir. 2002). *See also Reed*, 569 F. 3d at 579 (6th Cir. 2009); *Smith v. Pyro Mining Co.,* 827 F.2d 1081 (6th Cir. 1987) A "bona fide religious practice" or belief is one that is "religious and sincerely held." *Id.* Title VII's definition of religion includes "all aspects of religious observance and practice, as well as belief." *Id.,* citing 42 U.S.C. § 2000e(j). Further 29 C.F.R. § 1605.1 states that religious practices include "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious values." Section 2000e(j) "leaves little room for a party to challenge the religious nature of an employee's professed beliefs." *Union Independiente*. Religious beliefs are not required to be "acceptable, logical, consistent, or comprehensible to others," and that interfaith differences as to what is scripturally acceptable are "not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences." *Id.*

79.     Once an employee has made out a prima facie case of discrimination, the employer must show that it offered a reasonable accommodation, or that reasonable accommodation would be an undue burden. *Stanley v. Lawson Co.,* 993 F. Supp. 1084 (N.D. Ohio 1997).

80.     "An employer must . . . present evidence of undue hardship" and not

"rely merely on speculation," *Smith v. Pyro Min. Co.,* 827 F.2d 1081, 1085-86 (6th Cir. 1987), and the lack of substantive content in the Defendant's justification here demonstrates that the Defendant cannot show undue hardship.

81.     Merely stating that there is increased risk to the workplace and employee safety without explaining why and without providing evidentiary support cannot be sufficient to meet the Defendant's obligation under Title VII to establish undue hardship. Establishing "undue hardship" requires assessment of actual circumstances at the employer's place of business and of proposed and potential accommodations, and the Defendant's actions/lack of action demonstrates that the Defendant did not do the work of assessing undue hardship. *See id.*

82.     Undue hardship analysis must start with an analysis of proposed accommodations. The Defendant did not identify potential accommodations. Therefore, the Defendant did not reach the first step of analyzing accommodations. An employer violates Title VII if it fails to attempt as accommodation after accommodation is requested. *EEOC v. Arlington Transit Mix, Inc.,* 957 F.2d 219, 222 (6th Cir. 1991) ("[a]fter failing to pursue [a voluntary waiver of seniority rights] or any other reasonable accommodation, the company is in no position to argue that is was unable to accommodate reasonably [plaintiff's] religious needs without undue hardship."); *EEOC v. Ithaca Indus., Inc.,* 849 F.2d 116 (4th Cir. 1988) *cert denied* 488 U.S. 924 (1988) (same).

83.     An employer must demonstrate attempted accommodation before it claims undue hardship as a defense. *See, e.g., Redmond v. GAF Corp.,* 574 F.2d 897, 901-02 (7th Cir. 1978); *Shaffeld v. Northrop Worldwide Aircraft Serv., Inc.,* 373 F. Supp. 937, 944 (M.D.

Ala. 1974). The Defendant's justification for denying the Plaintiff's requests for religious exemptions demonstrates that it did not consider potential accommodations.

84.    Moreover, the Defendant clearly could have considered accommodations as dictated by the EEOC. In May 2021, the EEOC issued guidelines addressing the COVID-19 vaccines and rights and obligations of employers, titled *"What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws – Technical Assistance Questions and Answers"* (*"EEOC COVID-19 Guidance"*). The *EEOC COVID-19 Guidance* provides "examples of reasonable accommodations or modifications that employers may have to provide to employees who do not get vaccinated due to disability; religious beliefs, practices, or observance; or pregnancy." Reasonable accommodations the EEOC has identified as potentially not imposing an undue hardship on the employer include requiring the unvaccinated employee entering the workplace to:

(1) wear a face mask,

(2) work at a social distance,

(3) work a modified shift.

(4) get periodic tests for COVID-19,

(5) be given the opportunity to telework, or

(6) accept a reassignment.

*EEOC COVID-19 Guidance,* K.2.

85.    Beginning in March 2020, the Defendant had the opportunity to test many relevant accommodations for its employees, including daily assessments of personal health and potential exposure, availability of targeted COVID-19 testing, protocols requiring non-work

when symptomatic or potentially exposed to COVID-19, contact tracing, handwashing and hygiene, and the use of PPE.

86.     Such accommodations are understood to have prevented any substantial or material transmission of COVID-19 when used.

87.     In addition, other accommodations are potentially available. For instance, the EEOC has specifically identified testing of employees before they enter the workplace. The *EEOC COVID-19 Guidance* states, "an employer may choose to administer COVID-19 testing to employees before initially permitting them to enter the workplace and/or periodically to determine if their presence in the workplace poses a direct threat to others." *EEOC COVID-19 Guidance*, A.6.

88.     The Defendant's vaccine mandate did not even provided employees the illusory ability to obtain a religious or medical exemption from the vaccine mandate.

89.     The Plaintiff attempted to get guidance from her supervisor as well as the Executive Director the process by which she could submit a medical and/or religious exemption and was never provided a process that allowed such exemptions to be submitted, let along properly reviewed, considered, and granted when appropriate.

90.     The Defendant never told the Plaintiff how she could submit a religious exemption thereby making the submission of a religious impossible.

91.     The Defendant made submitting a medical exemption impossible given the time limits and went as far to as to tell Ms. Jackson, as well as other employees, it was a waste of time to even submit any exemptions.

92.     The Defendant improperly asserted and implied that the Plaintiff's

religious beliefs insincere by making vague allegations about medical products the Plaintiff has not taken to shame, demean, and harass the Plaintiff.

93.    The Defendant made no attempt to conduct an undue burden or direct threat analysis on any employees', including Plaintiff's, potential accommodation under Title VII and/or the ADA.

94.    The Defendant did not dispute that each of the COVID-19 vaccines currently available in the United States were developed or tested using cell lines derived from aborted babies.

95.    The Defendant did not engage the Plaintiff in a give and take discussion about potential accommodations. Plaintiff's willingness to comply with other safety measures were ignored.

96.    To the extent that the Defendant engaged in any communication with the Plaintiff about her request for accommodations, that communication was solely limited to trying to make the Plaintiff change her mind about her accommodations and making the Plaintiff feel foolish about making the request.

97.    It is well established that Title VII and O.R.C. § 4112 "have the same evidentiary standards and general analysis." *Gibbons v. Bair Foundation,* No. 1:04CV2018, 2007 WL 582314, at *4-5 (N.D. Ohio Feb. 20, 2007) citing *Greene v. St. Elizabeth Hosp. Med. Ctr.,* 134 F.3d 371, 1998 WL 13410, at *5 (6th Cir. 1998).

98.    The ADA prohibits the Defendant from discriminating against employees based on their disability as described by the EEOC:

> Employment discrimination is prohibited against "qualified individuals with disabilities." Persons discriminated against because they have a known association or relationship with a disabled individual also are protected. The ADA defines an "individual with a disability" as a person who has a physical

or mental impairment that substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment.
https://www.eeoc.gov/fact-sheet/ada-questions-and-answers;

99. The Plaintiff's medical condition qualifies as a disability so as to allow her a medical exemption to the COVID-19 vaccine.

100. The EEOC provides further guidance on how the COVID-19 vaccine comes into play with ADA requirements by stating:

The ADA's three-part definition of disability applies to COVID-19 in the same way it applies to any other medical condition. A person can be an individual with a "disability" for purposes of the ADA in one of three ways:

"Actual" Disability: The person has a physical or mental impairment that substantially limits a major life activity (such as walking, talking, seeing, hearing, or learning, or operation of a major bodily function);

"Record of" a Disability: The person has a history or "record of" an actual disability (such as cancer that is in remission); or

"Regarded as" an Individual with a Disability: The person is subject to an adverse action because of an individual's impairment or an impairment the employer believes the individual has, whether or not the impairment limits or is perceived to limit a major life activity, unless the impairment is objectively both transitory (lasting or expected to last six months or less) and minor.

The definition of disability is construed **broadly in favor of expansive coverage,** to the maximum extent permitted by the law. Nonetheless, not every impairment will constitute a disability under the ADA. The ADA uses a case-by-case approach to determine if an applicant or employee meets any one of the three above definitions of "disability." (emphasis added)

https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#N

101. It becomes clear by the Defendants' actions that they failed to meet their requirement whereas the Plaintiff met her responsibilities in attempting to gather all the

information required to show that she is in fact has an "actual disability." Unfortunately, the Defendants' never provided Plaintiff the time required to provide proof of her actual disability.

102.     The ADA imposes upon employers a statutory obligation to make reasonable accommodation for the disabilities, short of undue hardship. "An employer does not have to provide a reasonable accommodation that would cause an "undue hardship" to the employer. Generalized conclusions will not suffice to support a claim of undue hardship. Instead, undue hardship must be based on an individualized assessment of current circumstances that show that a specific reasonable accommodation would cause significant difficulty or expense." See 29 C.F.R. pt. 1630 app. §1630.15(d) (1996); see also Stone v. Mount Vernon, 118 F.3d 92, 101, 6 AD Cas. (BNA) 1685, 1693 (2d Cir. 1997)

103.     The Defendants clearly did not do as they were required in considering potential medical exemptions to the COVID-19 vaccine. By the Defendants not allowing a legitimate opportunity to file for medical exemptions they failed their numerous obligations under the ADA and accompanying Ohio State law.

104.     Given these facts, the Defendants' vaccination policy is vastly overreaching and unnecessarily violated federal and state law.

## COUNTS

### COUNT ONE

**Violation of Title VII, 42 U.S.C. § 2000e, *et seq.***
**Religious Discrimination-Failure to Accommodate**

105.     Plaintiff restates the foregoing paragraphs as if set forth fully herein.

106.     At all times relevant, Plaintiff was Defendant's "employee" within the meaning of 42 U.S.C. § 2000e(f).

107. At all times relevant, the Defendant was Plaintiff's "employer" within the meaning of 42 U.S.C. § 2000e(b).

108. Plaintiff holds sincere religious beliefs that preclude her from receiving a COVID-19 vaccine.

109. Plaintiff would have informed her employer, the Defendant, of those religious beliefs had she been allowed to request a religious accommodation.

110. The Defendant refused to engage in a meaningful interactive process with the Plaintiff regarding her religious accommodation request and instead only responded to Plaintiff with questions designed to challenge the Plaintiff's rights to file for accommodations to the COVID-19 vaccine. The Defendant failed to allow the Plaintiff to request reasonable accommodations for her religious beliefs, instead terminating her.

111. The Defendant thereby discriminated again the Plaintiff because of her religious beliefs.

112. By failing to engage in the interactive process or offer any reasonable accommodations, the Defendant's discriminatory actions were intentional and/or reckless and in violation of Title VII.

113. It is reasonable to infer from the totality of the circumstances that Defendant did not bother engaging in an interactive process with those seeking religious exemptions because the Defendant intended to discriminate against those seeking religious exemptions and never intended to provide any reasonable accommodations.

114. The Defendant illegally and improperly did not identify potential

accommodations as required by state and Federal law. The Defendant cannot assert the defense of undue hardship because it did not assert or show any hardship in declining to accommodate the Plaintiff's sincerely held religious beliefs.

115. By discriminating against Plaintiff, because of her sincerely held religious beliefs, in their decision to constructively deny Plaintiff's accommodation, the Defendant violated Title VII. And this violation has harmed and continues to harm Plaintiff.

116. Due to the Defendant's improper and willful, intentional and unlawful actions and the subsequent harm suffered by the Plaintiff, the Plaintiff asks the Court for the relief requested in her Prayer for Relief.

## COUNT TWO

**Violation of The Americans with Disabilities Act of 1990, as Amended ("ADA") 42 U.S.C. § 12111, *et seq.***
**Discrimination on the Basis of Actual Disability**

117. Plaintiff restates the foregoing paragraphs as if set forth fully herein.

118. At all times relevant, Plaintiff was Defendant's "employee" and a "qualified individual" as defined under the ADA 42 USC 12111(4), (8)

119. Under the terms of the ADA, one is considered to have a disability of he or she: has (A) a physical or mental impairment that substantially limits one or more of that person's major life activities; (B) has a record of such impairment; or (C) is regarded as having such an impairment..." 42 U.S.C § 12102(1).

120. To establish a disability under the first definition, having an actual impairment, the EEOC provides:

[A] person … [has an] actual disability if the person's medical condition or any of its symptoms is a "physical or mental" impairment that "substantially limits one or more major life activities." An individualized assessment is necessary to determine whether… a person's [disability] substantially limit a major life activity… Under the ADA, a physical impairment includes any physiological disorder or condition affecting one or more body systems. "Substantially limits" is construed broadly and should not demand extensive analysis. [The medical condition] need not prevent, or significantly or severely restrict, a person from performing a major life activity to be considered substantially limiting under Title I of the ADA.

https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#N

121.    The health conditions documented above have been with Plaintiff since she was a minor child and continue to this day.  Hence, they are not transitory nor minor.  Had the Defendants allowed Plaintiff to submit her medical exemption to the COVID-19 vaccine, it would have been perfectly clear that her disability easily carries the Plaintiff's burdens as required by the ADA and outlined by the EEOC.

122.    Plaintiff informed her employer, the Defendant, that she was attempting to gather all required medical information to file for a medical accommodation.

123.    At the time of termination, Plaintiff rightfully believed her medical condition precluded her from receiving a COVID-19 vaccine.

124.    The Defendant refused to engage in a meaningful interactive process with the Plaintiff regarding her medical accommodation request and instead only responded to Plaintiff with questions designed to challenge the Plaintiff's rights to file for accommodations to

the COVID-19 vaccine. The Defendant failed to allow the Plaintiff to request reasonable accommodations for her medical disability, instead terminating her.

125. The Defendant bullied and discouraged Plaintiff to not file her medical exemption even if she was able to gather all required medical information (which she was unable to gather all the required medical information in about three weeks) to meet the arbitrary and prohibitively short timeline required to not be terminated. Defendant told Plaintiff it was a waste of time to file her exemption(s) and that it would be better for Plaintiff to simply quit.

126. By discriminating against Plaintiff, because of her medical disability, in their decision to deny Plaintiff's accommodation opportunities, the Defendant violated the ADA. And this violation has harmed and continues to harm Plaintiff.

127. The Defendant illegally and improperly did not identify potential accommodations as required by state and Federal law. The Defendant cannot assert the defense of direct threat because it did not assert or show any threat in declining to accommodate the Plaintiff's medical disability.

128. It is reasonable to infer from the totality of the circumstances that Defendant did not bother engaging in an interactive process with those seeking medical exemptions because the Defendant intended to discriminate against those seeking medical exemptions and never intended to provide any reasonable accommodations.

129. By failing to engage in the interactive process or offer any reasonable accommodations, the Defendant's discriminatory actions were intentional and/or reckless and in violation of the ADA.

130.     Due to the Defendant's improper and willful, intentional and unlawful actions and the subsequent harm suffered by the Plaintiff, the Plaintiff asks the Court for the relief requested in her Prayer for Relief.

## COUNT THREE

### Violation of O.R.C. § 4112, *et seq.,*
### Religious Discrimination-Failure to Accommodate

131.     Plaintiff restates the foregoing paragraphs as if set forth fully herein.

132.     Plaintiff holds sincere religious beliefs that preclude her from receiving a COVID-19 vaccine.

133.     The Defendant created such a hostile work environment that employees were bullied into not filing religious exemptions.

134.     The lone documented vaccine policy made no mention of the Defendant's policy on submitting religious exemptions.  *See* **Exhibit C**

135.     Plaintiff had a sincerely held religious belief against taking the COVID-19 vaccine.

136.     The Defendant refused to engage in a meaningful interactive process with the Plaintiff regarding her religious accommodation request and instead only responded to Plaintiff with questions designed to challenge the Plaintiff's rights to file for accommodations to the COVID-19 vaccine. The Defendant failed to allow the Plaintiff to request reasonable accommodations for her religious beliefs, instead terminating her.

137.     The Defendant thereby discriminated again the Plaintiff because of

her religious beliefs.

138.    By failing to engage in the interactive process or offer any reasonable accommodations, the Defendant's discriminatory actions were intentional and/or reckless and in violation of O.R.C. § 4112, *et seq*.

139.    It is reasonable to infer from the totality of the circumstances that Defendant did not bother engaging in an interactive process with those seeking religious exemptions because the Defendant intended to discriminate against those seeking religious exemptions and never intended to provide any reasonable accommodations.

140.    The Defendant illegally and improperly did not identify potential accommodations as required by state and Federal law. The Defendant cannot assert the defense of undue hardship because it did not assert or show any hardship in declining to accommodate the Plaintiff's sincerely held religious beliefs.

141.    By discriminating against Plaintiff, because of her sincerely held religious beliefs, in their decision to constructively deny Plaintiff's accommodation, the Defendant violated O.R.C. § 4112, *et seq*. And this violation has harmed and continues to harm Plaintiff.

142.    Due to the Defendant's improper, willful, intentional, and unlawful actions and the subsequent harm suffered by the Plaintiff, the Plaintiff asks the Court for the relief requested in her Prayer for Relief.

## COUNT FOUR

### Violation of O.R.C. § 4112, *et seq.*,
### Disability Discrimination-Failure to Accommodate

143.    Plaintiff restates the foregoing paragraphs as if set forth fully herein.

144. Plaintiff has a medical disability that precludes her from receiving a COVID-19 vaccine.

145. The Defendant created such a hostile work environment that employees were bullied into not filing medical exemptions.

146. Defendant's vaccine policy included a deadline for filing for a medical procedure and a requirement that "all" medical histories being included making it impossible for Ms. Jackson to gather all the required medical documents to file her medical exemption before the Defendant's deadline.

147. Defendants never documented their medical exemption policy. Instead they explained it verbally only when employees went to them with their medical concerns of taking the COVID-19 vaccine.

148. The lone documented vaccine policy made no mention of the Defendant's policy on submitting religious exemptions. *See* **Exhibit C**

149. The Defendant refused to engage in a meaningful interactive process with the Plaintiff regarding her religious accommodation request and instead only responded to Plaintiff with questions designed to challenge the Plaintiff's rights to file for accommodations to the COVID-19 vaccine. The Defendant failed to allow the Plaintiff to request reasonable accommodations for her disability, instead terminating her.

150. The Defendant thereby discriminated again the Plaintiff because of her disability.

151. By failing to engage in the interactive process or offer any reasonable accommodations, the Defendant's discriminatory actions were intentional and/or reckless and in violation of O.R.C. § 4112, *et seq*.

152.    It is reasonable to infer from the totality of the circumstances that Defendant did not bother engaging in an interactive process with those seeking medical exemptions because the Defendant intended to discriminate against those seeking medical exemptions and never intended to provide any reasonable accommodations.

153.    The Defendant illegally and improperly did not identify potential accommodations as required by state and Federal law. The Defendant cannot assert the defense of direct threat because it did not assert or show any hardship in declining to accommodate the Plaintiff's sincerely held religious beliefs.

154.    By discriminating against Plaintiff, because of her disability, in their decision to constructively deny Plaintiff's accommodation, the Defendant violated O.R.C. § 4112, *et seq.* And this violation has harmed and continues to harm Plaintiff.

155.    Due to the Defendant's improper, willful, intentional, and unlawful actions and the subsequent harm suffered by the Plaintiff, the Plaintiff asks the Court for the relief requested in her Prayer for Relief.

## . PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the following relief:

A. Payment for all economic damages, including, but not limited to, back pay, front pay and benefit in amounts to be determined at trial;

B. Compensatory and consequential damages, and all non-economic damages, including for emotional duress;

C. Punitive damages;

D. Statutory damages;

E. Pre-judgment and post-judgment interest at the highest lawful rate;

F. An award of reasonable attorneys' fees, costs and expenses of all litigation to the extent allowable under federal and state law;

G. Trial by jury on all triable issues; and

H. Such other relief as the Court deems just and proper.


## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

*/s/Glenn Feagan*
Glenn Feagan (Bar No. 041520)
Deters Law
5247 Madison Pike
Independence, KY 41051
Phone. (859) 363-1900
gfeagan@feaganlaw.com